UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | NO. 3:16-cr-00196 |
| | ) | CHIEF JUDGE CRENSHAW |
| MITCHELL HUNTER OAKES, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On July 25, 2018, the Court held a hearing on Defendant's Motion to Suppress. (Doc. No. 160.) The Court denies the motion for the reasons stated on the record and herein.

I. Defendant's Fourth Amendment Standing to Challenge Collection and Use of Cell-Site Location Information

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Am. IV; Wong Sun v. United States, 371 U.S. 471, 488 (1963). The "basic purpose of this Amendment," the Supreme Court has recognized, "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Camara v. Municipal Ct. of City and Cty. of San Francisco, 387 U.S. 523, 528 (1967). The Supreme Court has held that when an individual "*seeks to* preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as *reasonable*," official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause. Smith v. Maryland, 442 U.S. 735, 740 (1979) (emphasis added). Above all, the Supreme Court has a "long history of insistence that Fourth Amendment rights are *personal* in nature." Rakas v. Illinois, 439 U.S. 128, 139 (1978) (emphasis added) (cited approvingly in Byrd v. United States, 138 S. Ct. 1518 (2018)).

Thus, "a defendant has standing to challenge the admission of evidence only if the defendant's *own* constitutional rights have been violated. In cases involving Fourth Amendment violations, we determine standing by deciding whether a defendant can establish a legitimate expectation of privacy in the area searched or the items seized." United States v. Mastromatteo, 538 F.3d 535, 544 (6th Cir. 2008) (emphasis added) (citing United States v. Davis, 430 F.3d 345, 359-60 (6th Cir. 2005)); see also United States v. Carriger, 541 F.2d 445, 551-52 (6th Cir. 1976) (explaining that the appropriate inquiry was not whether it was physically possible for an officer to gain entry, but rather, whether the tenant would have expected him to do so). Accordingly, as the Supreme Court has explained, the concept of "standing" in this particular area of the law is "not distinct from the merits and is more properly subsumed under substantive Fourth Amendment doctrine." Byrd, 138 S. Ct. at 1530 (citing Rakas, 439 U.S. at 139). Standing in Fourth Amendment cases nevertheless can be "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." Byrd, 138 S. Ct. at 1530 (citing Arizona Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 129 (2011); see also Rakas, 439 U.S. at 138-140 (stating that definition of Fourth Amendment rights "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing").

The United States Supreme Court in Byrd has recently reiterated the importance of determining "whether the person claiming a constitutional violation 'has had his *own* Fourth Amendment rights infringed by the search and seizure which he seeks to challenge.'" Byrd, 138 S. Ct. at 1526 (emphasis added) (quoting Rakas, 439 U.S. at 133). The Court explained that "[a]nswering that question requires examination of whether *the person claiming the constitutional*

*violation had* a "legitimate expectation of privacy in the premises" searched. Id. at 1526 (emphasis added). The Court noted that "property concepts" are instructive in this process and emphasized that "the central inquiry" often turns on the concept of "lawful possession."[1] Id. at 1529. As to how to evaluate a defendant's claim of possession and expectation of privacy, the Byrd Court said:

> On the one hand, as noted above, it is by now well established that *a person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it.* On the other hand, *it is also clear that legitimate presence on the premises of the place searched, standing alone, is not enough to accord a reasonable expectation of privacy*, because it "creates too broad a gauge for measurement of Fourth Amendment rights." Although the Court has not set forth a single metric or exhaustive list of considerations to resolve the circumstances in which a person can be said to have a reasonable expectation of privacy, it has explained that legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. The two concepts in cases like this one are often linked. One of the main rights attaching to property is the right to exclude others, and, in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.

Id. at 1527 (emphasis added) (internal citations and quotation marks omitted). In other words, the Court explained that while someone may not necessarily need a traditionally-understood property interest to invoke the Fourth Amendment, a person cannot merely invoke Fourth Amendment rights because they happen to be legitimately located in the place searched. This mere "presence" metric would create "too broad a gauge" to measure Fourth Amendment rights. And so the Byrd Court noted the analytical importance of the "right to exclude," which is common to both concepts of possession and societal expectations of privacy. Byrd involved a motion to suppress filed by a

---

[1] The Court mentioned, for example, that wrongful presence at the scene of a burglary would not enable a defendant to object to a search, nor would a defendant's presence in a stolen automobile. Byrd, 138 S. Ct. at 1529.

3

defendant who was driving a rental car for which he was not formally authorized. Based on the above rationale, the Court concluded that "the mere fact that a driver *in lawful possession or control* of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy" and reversed and remanded the case.[2] Id. at 1531 (emphasis added). The United States Court of Appeals for the Sixth Circuit has in the past set forth similar principles, directing courts to consider, among other factors, a defendant's proprietary or possessory interest in the place to be searched or the item to be seized; whether he had the right to exclude others from the place in question; and whether he had taken normal precautions to maintain his privacy. See United States v. Dillard, 438 F.3d 675, 682 (6th Cir. 2006) (citing United States v. King, 227 F.3d 732, 744 (6th Cir. 2000)).

In Carpenter v. United States, 138 S. Ct. 2206 (2018), the Supreme Court confronted the question of whether, in the modern technological era, a defendant could claim a Fourth Amendment expectation of privacy in historical cell-site location information ("CSLI") *of his own phone*. 138 S. Ct. at 2206. Carpenter involved a situation in which the Government applied for court orders (under, as here, the Stored Communications Act) to obtain CSLI for the cell phones of several suspects. Critically, there was no question about the ownership or control of the cell phones for which CSLA was obtained, and standing to bring the Fourth Amendment challenge was never questioned (or even discussed). See United States v. Carpenter, 819 F.3d 880, 884 (6th Cir. 2016) ("The robber who confessed to the crimes gave the FBI his own cellphone number and the numbers of other participants."); Carpenter, 138 S. Ct. at 2206. The Supreme Court's finding as to an enforceable privacy interest in CSLI was, therefore, premised upon the subject phones being in the possession and control of the defendants. Carpenter says nothing about an enforceable

---

[2] In this way, Byrd is actually a *generous* decision in the area of standing for those who can manage an appropriate modicum of possession or control. It does not, however, abandon underlying principles.

Fourth Amendment privacy interest in a cell phone that a defendant does not know is tracking him or does not admit to possessing or controlling.

Carpenter clearly reflects that the Supreme Court only considered the issue of someone alleging a violation of the privacy of their own phone. Finding that the case involved the intersection of interests in (a) *personal* movements (id. at 2215) and (b) information that a person deliberately *keeps to himself* (id. at 2216), the Supreme Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." Id. at 2217. The Court explained that mapping the location of *a person's* cell phone over the course time "provides an all-encompassing record of *the holder's* whereabouts . . . [and] an intimate window into *a person's* life, revealing not only *his* particular movements, but through them *his* 'familial, political, professional, religious, and sexual associations.'" Id. at 2217 (emphasis added). The Court stressed that a cell phone (and attendant CSLI) "tracks nearly exactly the movements *of its owner*." Id. at 2218 (emphasis added). Accordingly, the Court concluded, "when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor *to the phone's user*." Id. (emphasis added). In this context, the Court held that the Government "must generally obtain a warrant supported by probable cause before acquiring [CSLI]." Id. at 2221.

At the motion hearing, Detective Brandon Sandrell of the Franklin Police Department testified that the Government identified the 931-***-6154 phone ("T3") as associated with Defendant as a result of a search of the public "CLEAR" database.[3] (Doc. No. 251 at 22.) However,

---

[3] Detective Sandrell testified that the CLEAR database stated only that T3 had been associated with Defendant by the credit reporting agency Experian. (Doc. No. 251 at 23-24.) Subsequent investigation by the Government revealed that Experian received the number from Ford Motor Credit and uploaded it to the CLEAR database on September 8, 2016. (Id. at 29-31.) Defendant and the alleged victim co-owned a Ford Escape, but the car was in the possession of the alleged victim. (Id. at 30.) Detective Sandrell testified that he only knew that a male called Ford Motor Credit on the T3 phone. (Id. at 24.) This testimony does not alter the Court's analysis regarding the possession, control, or use of T3.

5

Defendant's counsel represented to the Court that Defendant, at no time in his life, has ever: (1) bought or owned T3; (2) knowingly possessed T3; (3) used T3; (4) controlled who used T3; (5) excluded others from using T3; or (6) authorized others to use T3. (Id. at 3-5.) Counsel further conceded that if T3 tracked Defendant, he had no knowledge of it "at any time." (Id. at 5.) Defendant's brief backed this up: he asserted that it would be a "lie" and "perjury" for Defendant "to admit ownership of the phone." (Doc. No. 189 at 2.) Rather, defense counsel advanced the theory that perhaps the alleged victim or her agents had either followed Defendant around with the phone or planted it in his vehicle, and that, as a result, his movements were *unknowingly* tracked by T3 for a period of time. (Id.; see also id. at 9 ("It's not a possessory interest. It's not an ownership interest. But if it's following you . . .").) To this end, Defendant filed an affidavit, admitted into evidence at the hearing, stating that: "On September 9, 2016 the cell phone 931-[***]-6154 tracked my physical movements in Crossville and Pikeville Tennessee area from approximately 6:47 a.m. until 8:37 p.m." (Doc. No. 171-1.)

Defendant argues that (1) Carpenter and Byrd have together abrogated the Fourth Amendment "standing" concept of needing to have a possessory interest in an item or place that has been searched; (2) Carpenter created a broad privacy interest in the whole of an individual's physical movements; and (3) as a result, Defendant has Fourth Amendment standing to challenge the collection of CSLI for a cell phone that Defendant did not own, use, control, exclude others from using, knowingly possess, or have any awareness might be tracking him. The Government reads Byrd more narrowly and does not understand Carpenter to have disturbed traditional Fourth Amendment standing principles.

Defendant's ambitious reading of Carpenter cuts far too wide a swath across Fourth Amendment jurisprudence. In the Court's view, Carpenter has not changed that, before Defendant

6

can assert a Fourth Amendment violation, he has to be able to assert a personal connection to the place or object in which he claims a privacy right. As a result, Carpenter does not afford a criminal defendant standing to challenge the collection of CSLI from a cell phone for which he *denies* the ownership, possession, control, use, and exclusion of others. Without a grant of standing under Carpenter, there is no standing consistent Fourth Amendment principles. Under Byrd and preceding caselaw, without ownership, possession, custody, or control, Defendant had no reasonable expectation of privacy in the "the invaded place" – i.e., T3 – such that the gathering of the attendant CSLI could constitute a "search" that would potentially trigger Fourth Amendment protections. Rakas, 439 U.S. at 143 (citing Katz v. United States, 389 U.S. 347, 353 (1967)). Specifically, the implication that somewhere, somehow, for some period of time, T3 was in the same place as Defendant is fundamentally insufficient. Our society does not consider being in the unknowing presence of a thing to establish a *reasonable* expectation of privacy in that thing, even if that thing happens to be incriminating.[4] Without knowledge or control of T3, Defendant could have no personal stake in it; Defendant could not deliberately exclude others from using it; and Defendant could not "exhibit[ ] an *actual (subjective)* expectation of privacy" in its CSLI. Katz, 389 U.S. at 361 (emphasis added) (Harlan, J., concurring).

Defendant has not established that he has the necessary personal Fourth Amendment interest to challenge the collection of CSLI for the T3 phone. Defendant's Motion to Suppress will be denied in this respect.[5]

---

[4] Indeed, taken to its logical conclusion, the rule that Defendant advances is so broad that it would enable someone to challenge the search of the CSLI of anyone that person happened to be with or near because he was incidentally tracked by that other person's phone. Neither Byrd nor Carpenter supports such a conclusion.

[5] Defendant admits to having "used and possessed" a different phone – 931-***-7517 (i.e., "T2"). On July 23, 2018, the parties clarified in open court that the Motion to Suppress did not concern T2.

II.  Search Warrant and Sufficiency of Probable Cause

Defendant argues that absent three alleged falsehoods in the Affidavit of Probable Cause submitted to the Magistrate Judge in support of the Government's application for a warrant to search 76 Oakes Lane, Pikeville, Tennessee, there would have been a lack of probable cause for the issuance of the warrant. The Government concedes several, but not all, of the asserted defects, and argues that the evidence put forth in the Affidavit was sufficient even without the problematic elements.

If a search warrant is not supported by probable cause, then its execution results in a violation of the Fourth Amendment. See United States v. Leon, 468 U.S. 897, 900 (1984). "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." Ziegler v. Aukerman, 512 F.3d 777, 785 (6th Cir. 2008). A defendant is entitled to a hearing to challenge the validity of a search warrant if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [ ] the allegedly false statement is necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155-56 (1978); Mastromatteo, 538 F.3d at 545. "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Franks, 438 U.S. at 171-72 (footnote omitted). What remains of the affidavit establishes probable cause if it "provide[s] the magistrate judge with a basis for finding there was a fair probability that contraband or evidence of a crime would be found at" the stated location. United States v. Graham, 275 F.3d 490, 504 (6th Cir. 2001). Generally, "[t]he review of

the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." United States v. Berry, 565 F.3d 332, 338 (6th Cir. 2009).

Omissions "are not immune from inquiry under Franks, but the Sixth Circuit has recognized that an affidavit that omits potentially exculpatory information is "less likely to present a question of impermissible official conduct than one which affirmatively includes false information." United States v. Atkin, 107 F.3d 1213, 1217 (6th Cir. 1997). Indeed, a Franks hearing is only merited in cases of omissions in "rare instances." Mays v. City of Dayton, 134 F.3d 809, 815 (6th Cir. 1998). "This is so because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." Atkin, 107 F.3d at 1217 (internal quotation omitted). "To merit a hearing, the defendant must make a preliminary showing that the affiant engaged in deliberate or reckless disregard of the truth in omitting the information from the affidavit." United States v. Graham, 275 F.3d 490, 506 (6th Cir. 2001). The court must then consider the affidavit along with the omitted portions and determine whether probable cause still exists. Id (citing Atkin, 107 F.3d at 1217).

On September 11, 2016, ATF Special Agent Marnie Musgrave filed the Application for a Search Warrant in the United States District Court for the Eastern District of Tennessee. (Doc. No. 163 at 2.) The Application sought to search 76 Oakes Lane for concealed property including: "firearms & ammunition; black powder or low explosives; metal pipes, plates, and fragments for use in improvised explosives; empty bottles or similar for construction of improvised explosives; switches, activators, initiators, or fuses used to ignite explosives; and records relating to the purchase, acquisition, or manufacture of the items listed above." (Id.) Special Agent Musgrave attached a seven-page Affidavit of Probable Cause consisting of 21 paragraphs. (Id. at 3-9.)

Defendant first objects to Special Agent Musgrave's statement that: "Franklin Police Department officer Samantha Brooks has reviewed the video surveillance footage from the Kangaroo Market for this time and date and observed MITCHELL OAKES on the video at the time corresponding closely to the GPS information from the phone." (Id. at 8, ¶ 17.) Defendant maintains that this was a false or reckless statement because no identification was possible due to the poor quality of the Kangaroo Mart video. At the hearing, the Government conceded that this was a false identification.[6] (Doc. No. 251 at 45-46.) As discussed on the record, the Court assumes for purposes of this analysis that this false identification corrupts the related sentences in Paragraph 17 to which it gives added meaning. (Id. at 48-51.)

Second, Defendant objects to the explanation in the Affidavit that T3 was in the Franklin area for more than two hours, spending at least 35 minutes in the area of the National Healthcare Corporation ("NHC") assisted living center where the bomb was found. (Doc. No. 163 at 8, ¶ 18.) Defendant maintains that this was false because, in reality, data shows that T3 was only in the Franklin area for 15 minutes and the NHC area for 13 minutes, undermining the idea that the bomb was placed in the alleged victim's car while she was at the NHC. The Government concedes that these specific times listed in the Affidavit were incorrect. (Id. at 45-46, 52.) The other times listed in Paragraph 18 are unrelated to the false statements. (Id. at 52-53.)

---

[6] In its brief, the Government argued that this identification by Brooks should not be attributed to Special Agent Musgrave. The Government did not advance this argument at the hearing. It is nonetheless without merit because the case upon which the Government relied, United States v. Hawkins, 278 F. App'x 629, 634 (6th Cir. 2008), is not on point. In that case, the defendant argued that, because a detective never actually saw an informant enter his residence (because he drove around the block and left that task to others), his statement in the warrant affidavit that the informant was never out of visual contact during the transactions other than when he was inside the residence was made with reckless disregard for the truth. Hawkins, 278 F. App'x at 633. The Court noted that the warrant stated that other officers in the Vice/Criminal Intelligence Unit observed the informant enter and exit the residence. Id. at 634. Therefore, the defendant's suggestion that it may have been a case of mistaken identity was insufficient to prove that the detective intentionally provided false information in the warrant affidavit or made statements with reckless disregard for the truth. Id.

Finally, Defendant contends that the Affidavit suffered from the omission of not explaining that the alleged victim had not only found the bomb and looked at it, but had also handled the bomb. (Doc. No. 163 at 5, ¶ 6.) The Government responds that the alleged victim actually stated:

> When I left work on 9-10-16 to get into my car it was hard[.] I hit the unlock button again and pulled hard on the door and opened it. I saw a black wire in my driver seat and then a wine bottle and metal piece with a black trash bag around it on the door. I picked up on the metal piece thinking it was something broken on the car when I realized what it was I immediately called NHC supervisor to keep the safety of everyone . . ."

(Doc. No. 179 at 2-3.) In other words, when the alleged victim saw something strange in her car door, she touched it thinking it could be something broken, and then she realized that it was a bomb. (Doc. No. 251 at 57.) The Government argues that this information is not material, and it also was not necessary because the Government was not required to provide every fact known in the investigation to the Magistrate Judge. (Id. at 57-58.) Indeed, that the alleged victim handled the bomb might have been helpful information for the Magistrate Judge to have, but the Court is limited in the amount of conjecture it may entertain about any benefit Defendant might have garnered from it. Generally speaking, an affidavit of probable cause "is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." United States v. Allen, 211 F.3d 970, 975 (6th Cir. 2000).

Assuming, *arguendo*, that the statements as to the Kangaroo Market video and CSLI time tracking in the Affidavit were reckless, the Court examines whether there remained sufficient content in the Affidavit to support the Magistrate Judge's finding of probable cause. Franks, 438 U.S. at 171-72. The Court looks to whether the remains of the affidavit would still provide the Magistrate Judge with a basis for finding there was "a fair probability that contraband or evidence of a crime would be found at" Defendant's home. Graham, 275 F.3d at 504. "The affidavit should

be reviewed in a commonsense . . . manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause." United States v. Woosley, 361 F.3d 924, 926 (6th Cir. 2004).

The search warrant at issue was for suspected violations of 18 U.S.C. § 922, possession of firearms, ammunition, or explosives by a convicted felon, and 26 U.S.C. § 5861, receipt or possession of a designated firearm or explosive not registered in the National Firearms Registration and Transfer Record. (Id.) 18 U.S.C. § 921(a)(3) defines "firearm" to mean weapons capable of discharging projectiles as well as "destructive devices," which are further defined to include, among other things, bombs, grenades, or any similar devices. In other words, Defendant was being sought on charges of illegally possessing either firearms or destructive devices. The balance of the Affidavit contains the following information:

1. The alleged victim had personal knowledge that Defendant "has extensive knowledge and experience in the manufacture of and use of explosive devices." (Doc. No. 163 at ¶ 3.)

2. Through personal observations prior to September 9, 2016, the alleged victim saw Defendant engaged in the manufacture and use of explosive devices. (Id.)

3. As recently as June 2016, the alleged victim observed Defendant detonate an explosive that left a large hole in the ground. (Id. at ¶ 19.)

4. The alleged victim advised law enforcement that Defendant resides at 76 Oakes Lane, Pikeville, Tennessee, and that "there are numerous firearms in the residence and in at least one outbuilding, many of which belong to Defendant." (Id.)

5. The alleged victim further advised that there was ammunition reloading equipment, including black powder, at Defendant's residence. (Id.)

6. The alleged victim last personally observed the firearms at Defendant's residence in April 2016. (Id.)

7. ATF Special Agent Nerissa Dixon had checked the National Firearms Act Registry ("NFA") (also known as the National Firearms Registration and Transfer Record) and found that Defendant did not have any firearms or explosives registered to him in the NFA. (Id. at ¶ 10.)

8. Defendant's criminal history includes convictions for solicitation to commit second degree murder (2007) and felon in possession of firearm (2014). (Id. at ¶ 15.)

The Sixth Circuit has granted great deference to the issuing judge when information forming the basis for probable cause comes from a known eyewitness rather than an anonymous tip. United States v. Pelham, 801 F.2d 875, 878 (6th Cir. 1986); United States v. Miller, 314 F.3d 265, 270 (6th Cir. 2002). "When a witness has seen evidence in a specific location in the immediate past, and is willing to be named in the affidavit, the totality of the circumstances presents a substantial basis for conducting a search for that evidence" and the warrant exhibits on its face "the probability . . . of criminal activity." Pelham, 801 F.2d at 878 (internal quotation marks omitted). Moreover, the Sixth Circuit has acknowledged that "[w]hen it comes to guns . . . individuals who own guns keep them at their homes." Peffer v. Stephens, 880 F.3d 256, 271 (6th Cir. 2018) (citing United States v. Smith, 182 F.3d 473, 480 (6th Cir. 1999)).

The time that elapsed between April 2016 and September 2016 did not make the alleged victim's observations stale. U.S. v. Goodwin, 552 F. App'x 541, 545-46 (6th Cir. 2014) (holding felon in possession of a firearm is an ongoing offense that weighs against a finding that the information was stale); United States v. Vanderweele, 545 F. App'x 465, 469 (6th Cir. 2013) (seven month delay before search not problematic because the crime of possession of weapon "was likely to continue for an extended period, even throughout the suspect's lifetime); United States v. Pritchett, 40 F. App'x 901, 905-06 (6th Cir. 2002) (where magistrate judge issued a warrant more than four months after the witness claimed to have last seen the defendant in possession of

firearms, concluding that because "[f]irearms are durable goods and might well be expected to remain in a criminal's possession for a long period of time," the witness's information regarding the firearms was not stale).

Here, the Affidavit contained the direct statements of the alleged victim, Defendant's estranged wife who had previously lived with him. The alleged victim stated her personal observations that Defendant had (1) manufactured and used explosive devices prior to September 2016, (2) owned numerous firearms and firearm-related equipment as recently as April 2016, and (3) set off a bomb as recently as June 2016. The Affidavit also stated that Defendant had no registered firearms, and thus it provided evidence related to both crimes of which Defendant was accused. Upon reviewing the four corners of the Affidavit, the Court concludes that the remaining information therein was sufficient, in the absence of the false Kangaroo Market identification and incorrect CSLI time tracking information, to establish a fair probability that firearms or explosives directly relevant to the two specifically-named crimes might be found at 76 Oakes Lane.[7] See, e.g., Vanderweele, 545 F. App'x at 469 (6th Cir. 2013) (upholding a search warrant based on nothing more than an informant's statement that the defendant had been in possession of a silencer and an agent's awareness that firearms, ammunition, and related items are commonly stored within the owner or possessor's dwelling); United States v. Brown, Criminal Action No. 1:15-CR-10-GNS, 2015 WL 9238965, at *2 (W.D. Ky. Dec. 17, 2015) (denying motion to suppress warrant for search of defendant's home for firearm based on testimony of sole witness who saw defendant in

---

[7] Indeed, the Court notes that even if the alleged victim had merely stated that Defendant possessed firearms, and not identified the specific location, "in cases involving a variety of suspected crimes, that an issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence. United States v. Williams, 544 F.3d 683, 688 (6th Cir. 2008). Thus, it would have been logical for the Magistrate Judge to conclude that, if Defendant possessed a number of firearms, they might be located at his residence.

possession of weapon at that location). Accordingly, the Court will deny this portion of Defendant's Motion concerning the search warrant.

III.     Conclusion

For the foregoing reasons, Defendant's Motion to Suppress (Doc. No. 160) is **DENIED**.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE